UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re:  RONALD L. HECKMAN, | : | Case No. 14-20072REF |
| Debtor | : | Chapter 13 |

| | | |
|---|---|---|
| RONALD L. HECKMAN, | : | Adv. No. 15-317REF |
| Plaintiff | : | |
| v. | : | |
| READING AREA WATER AUTHORITY, | : | |
| Defendant | : | |

# MEMORANDUM  OPINION

# I.  INTRODUCTION

Ask a 5th or 6th grade school child how many days are in three months. I expect that most would tell you 90 days (which does not account for months with 28/29 or 31 days, but you get the idea). Ask that child whether 60 days equals 90 days and you would get a funny look. These simple riddles, among other hand-wringing, brow-furrowing aspects of this case, were brought out through the testimony of Defendant water authority's employee during examination by her counsel (and the court[1]), resulting in a decidedly unusual answer: When is 60 days equal to both 90 days and three months? The answer: When Defendant says it is.

---

[1] During the trial, I explained my rationale for pressing this issue through my questioning the witness. See N.T., 3/9/16 trial, p. 129: "I started off at the first hearing saying the District Court requires us to bend over backwards with creditors [sic] [pro se parties]. And my view has always been to try to find out what's going on, regardless of whether I ask questions or not." I want to find out relevant facts, even if I must ask questions of witnesses myself.

This hubris and numerological fallacy highlight a troublesome and unsettling aspect of Defendant's record-keeping, administration, and arguments in this case. It is just plain wrong. Details are below.[2]

Pro se Plaintiff tried unsuccessfully for some time to wrest information about his account from Defendant. He was determined not to pay invoices that he did not understand. His efforts included filing four bankruptcies in about 13 months. Plaintiff was completely right and completely wrong in some of what he did. And he was completely right and completely wrong in some of what he did not do. This case sets up a classic dispute of an individual citizen versus a monolithic government agency - in this case a water utility. In many instances, a public utility has, and must have, rules and regulations to govern its rights and actions and the rights and actions of its customers. This Memorandum Opinion examines the good, the bad, and the ugly[3] of (1) the automatic stay established upon the filing of a bankruptcy case, (2) Plaintiff's refusal to pay some of RAWA's bills because he misunderstood Defendant's rules and regulations, and (3) the administration and application of those rules and regulations to Plaintiff.

---

[2]        See p. 11, n. 11, and text at pp. 27-30, infra.
[3]        With apologies to Sergio Leone, Clint Eastwood, Lee Van Cleef, and Eli Wallach in The Good, the Bad, and the Ugly (1966).

I address this tri-faceted dispute between a customer and a municipal water authority, to determine (1) whether Defendant, through its collection efforts, violated the automatic stay (it did not violate the stay - good), (2) Plaintiff's objection to Defendant's claim, which alleges that Plaintiff had failed to pay the principal amount of his water and sewer bills (he had not paid - bad), and (3) Plaintiff's objection to Defendant's claim for collection fees (Defendant's treatment of delinquent accounts - ugly).

# II.  FACTUAL AND PROCEDURAL DISCUSSION

This Memorandum Opinion resolves the dispute between Plaintiff/Debtor, Ronald Luther Heckman ("Heckman"), and Defendant/Creditor, Reading Area Water Authority ("RAWA"), addressing first whether RAWA's collection efforts violated the automatic stay and second Heckman's water and sewer bills and collection costs (as contained in RAWA's claim). The trial on Heckman's claim of a violation of the automatic stay and the hearing on his objection to RAWA's claim number 6 were heard together. Over a period of five days in February and March 2016,[4]  the parties presented their evidence, creating a consolidated record consisting of testimony and exhibits. Heckman and RAWA filed timely briefs, after which Heckman asked leave to reply to RAWA's brief. RAWA made no similar request. I granted Heckman's request and he timely filed his reply brief.  Both matters (RAWA's alleged violation of automatic stay and Heckman's objection to RAWA's claim) are now ready for disposition.[5]

---

[4]      The hearing/trial dates were February 8, 19, & 29, and March 9 & 22, 2016.

[5]      Disposition of this dispute took an extraordinary amount of time to prepare. The legal issues are relatively simple, but the factual issues are buried in the minutiae and detail of hundreds of pages of transcripts and exhibits, which contain, inter alia, invoices, summaries of the account, emails, rules, and regulations.

4

# A.  Procedural History

Heckman filed this chapter 13 case on December 29, 2014, as the fourth bankruptcy case he had filed in about 13 months. His first case, No. 13-20461REF, was filed on December 2, 2013, and was dismissed on January 9, 2014. Heckman's second case, No. 14-10537REF, was filed on January 24, 2014, and was dismissed on November 20, 2014. His third case, No. 14-19877REF, was filed on December 17, 2014, and was dismissed on December 19, 2014.[6]

On December 29, 2014, Heckman filed his petition in this chapter 13 case, which remains pending. Heckman's three prior bankruptcy cases had been dismissed within one year before this fourth bankruptcy case was filed. The automatic stay, therefore, had not gone into effect when this bankruptcy case was filed. See 11 U.S.C. §362(c)(4)(A)(i). On January 12, 2015, Heckman filed a motion to extend the automatic stay under 11 U.S.C. §362(c)(4)(B), which I granted over the objection of RAWA in my Order dated February 19, 2015.

RAWA filed its proof of claim on May 7, 2015, alleging that it holds a secured claim in the amount of $5,608.09. Heckman filed both his adversary complaint and his objection to RAWA's proof of claim on July 10, 2015. The

---

[6]     Heckman had filed more bankruptcies before December 2013, but the four listed in this paragraph are the cases that are relevant here.

adversary complaint alleges that RAWA engaged in certain collection activity that violated the automatic stay of Section 362. RAWA filed its answer to the complaint on August 12, 2015, and its motion for partial summary judgment on December 10, 2015. Heckman opposed the summary judgment motion about a month later. On January 26, 2016, I granted, in part, RAWA's motion for partial summary judgment on the adversary complaint and the case proceeded to trial.

In my January 26, 2016 Order granting in part RAWA's motion for partial summary judgment, I explained that my February 19, 2015 Order granting Heckman's motion to extend the automatic stay under 11 U.S.C. §362(c)(4)(C) was not retroactive.[7] Therefore, I concluded that any conduct by RAWA that occurred prior to February 19, 2015, could not have violated the automatic stay because no stay existed. I granted, in part, RAWA's motion for summary judgment, concluding that only conduct by RAWA that occurred on or after February 19, 2015, could constitute a violation of the automatic stay. Because Heckman had alleged sufficient facts from which I might find that RAWA's post-February 19, 2015, conduct might have violated the automatic stay, I denied the balance of RAWA's summary judgment motion.

---

[7]    Section 362(c)(4)(C) provides that a stay imposed under subparagraph (B) shall be effective on the date the order is entered allowing the stay to go into effect. Throughout this case, however, Heckman has pressed his belief that my Order was, in fact, intended to be retroactive. At all times throughout this case, however, I definitely meant, I have definitely stated, and I definitely mean that the Order was not retroactive.

Both the adversary complaint dealing with the automatic stay and

Heckman's objection to RAWA's proof of claim are now ready for me to decide.

## B.   <u>Factual History</u>

Heckman owns two rental properties in Reading, Pennsylvania. One is

located at 101 Walnut Street ("101 Walnut") and the other is located at 153 Walnut

Street ("153 Walnut"). RAWA provides water and sewer service to all properties

in Reading, including the two properties owned by Heckman.

The present difficulties between RAWA and Heckman began in

earnest when Heckman received a letter from RAWA dated February 28, 2012.

Exhibit D-1, contained in Tab P-1. The letter advised Heckman that RAWA's

February 10, 2012, water meter reading for 101 Walnut showed excessive

consumption compared to average usage. The letter included a reference to a

RAWA resolution that provides, among other things, that a customer may qualify

for relief from an excessive charge if the excessive consumption was caused by a

leak in the customer's water service and if certain procedures are followed, as

outlined in the resolution and the letter. The letter further instructed that once the

steps outlined in the resolution[8] were completed, a customer must fill out a

---

[8]      Two of the required steps in the resolution were to hire a licensed plumber to fix the leak and to
have the leak repaired to the satisfaction of RAWA within thirty days of the discovery of the leak.

complaint form and send it to RAWA with a copy of the plumber's permit,

showing that the plumber was licensed in Reading, and a copy of the plumber's

invoice, showing that the leak was repaired by the licensed plumber within thirty

days after the date it was discovered. N.T. 3/22/16 trial, p. 7.[9]

Rather than have the leak repaired by a licensed plumber, however,

Heckman repaired the leak himself. He sent RAWA a letter dated May 7, 2012

(over two months after the February 28 letter from RAWA), confirming that he

found a leaking toilet and fixed it himself, by simply replacing the flapper and

chain in the toilet. Exhibit D-1, contained in Tab P-1. Heckman's May 7 letter goes

on to state that on March 2, 2012, he had heard the sound of running water from

the meter. He described the situation as "the meter going wild [with] [t]the needle

circling like crazy." Id. Heckman further explained in the letter that he flushed the

meter and turned the water on and off several times before the sound of running

water stopped. It appears to me that none of these functions requires a licensed

plumber to resolve. Regardless who should have remedied the problem, Heckman

failed to comply with the other elements required to make an effective request to

reduce the water charges.

---

[9]    Ms. Ruotolo testified that according to the Plumber Standards for the City of Reading, owners are permitted to fix small issues on their own for property that is owner occupied. The owner may then submit the request for an adjustment of the bill caused by the leak. If the property is a rental unit, however, Reading's code requires that work be done by a licensed plumber. Ms. Ruotolo expressed no view about how or why this dichotomy exists.

Heckman's May 7, 2012 letter to RAWA also analyzed the water

consumption at 101 Walnut over the course of approximately one year. Heckman

eschewed expert consultation, but he concluded that the excessive water

consumption was caused by problems with the water meter or from trucks and

vibrations from repairmen fixing the street after a sinkhole had appeared.

Heckman's May 7 letter concludes by requesting relief in the form of a credit to his

bill in the amount of $952.54. RAWA denied his request in its letter dated October

12, 2012. Exhibit D-1, contained in Tab P-1. RAWA explained that Heckman's

request for an adjustment in his bill was denied because a toilet was running during

the period of excess water consumption and Heckman had failed to comply with

RAWA's leak adjustment qualifications.

Heckman filed an informal complaint with the Pennsylvania Public

Utilities Commission (the "PUC") on November 13, 2012, asking the PUC to

direct RAWA to investigate his situation to determine if the excessive water

consumption was caused by a defective water meter or other equipment causing

the water meter to malfunction. Exhibit D-1, contained in Tab P-1. The PUC

responded to Heckman's informal complaint by stating that it does not regulate

municipal authorities.

Thinking his May 7, 2012 letter to RAWA created a legitimate

dispute, Heckman began withholding payments to RAWA, erroneously relying on

a provision of a RAWA ordinance that deals with "applications for water service."

<u>See</u> Exhibit D-1, contained in Tab P-2, June 30, 1994 RAWA Resolution, Rules

and Regulations, §5(c)(iii). Heckman was already receiving water service from

RAWA and the regulation on which he relied applied only to applications for new

water service. That regulation therefore did not apply to Heckman's situation or

account and did not authorize Heckman to withhold payment of any bills that were

due on his account. Because Heckman withheld his payments, his account with

RAWA went into delinquent status.

And then the enmity and problems really accelerated. Not only was

Heckman dealing with a largely unaccountable municipal entity in RAWA, but he

was also forced to deal with a collection entity that had no accountability to anyone

or for anything other than collecting bills owed to RAWA and taking collection

fees for itself. RAWA's current policy (in effect during this dispute) dictated that

an account be turned over to its collection agent, Accounts Recovery Bureau, now

known as Arcadia Recovery Bureau ("ARB"),[10] when it became 91-days[11]

delinquent and had a balance due of more than $100. N.T. 3/9/16 trial, p. 14.

      When an account was turned over to ARB for collection, bills sent by

RAWA to its customer show only the current charge and state "MUST CALL"

beside the column marked "PAST DUE AMOUNT." RAWA's decision not to

provide its customers with sufficient information on their bills to understand the

status of their accounts may have saved RAWA the costs, expenses, and headaches

of collection efforts, but it led to tremendous uncertainty in, at least, Heckman's

ability to calculate his bills. Furthermore, Heckman was forced to deal with a

collection agency that made its money, not by providing goods or services to

residents of the city of Reading, but by extracting collection fees[12] out of RAWA's

customers.

---

[10]    At some point in time (the record is unclear when), a company known as Kadent sold Accounts
Recovery Bureau to a company known as Arcadia Recovery Bureau, and Accounts Recovery Bureau is
now known as Arcadia Recovery Bureau and continues to be known as ARB. N.T. 3/9/16 trial, pp. 3-5.
Because the exact identity and name of the collection agency is irrelevant to the outcome of this
proceeding, I will refer to the collection agency generically as ARB throughout this Opinion.
    I note, however, that both collection entities use the word "Bureau" in their names, which might
very well lead a customer to believe incorrectly that they were affiliated with the city of Reading as one
of its bureaus, thereby perhaps having some accountability to citizens.
[11]    Ms. Ruotolo testified that the fourth calendar month after an invoice was due to be paid it would
be considered delinquent and equivalent to being 91 days delinquent. N.T. 3/19/16 trial, pp. 15-20. A bill
sent out in the middle of September would be payable on September 30, according to RAWA's policies.
That counts as month one. October and November count as months two and three. The first day of
December is considered the fourth month. So one day in September, 31 days in October, 30 days in
November, and one day in December equals 90 days delinquent. For more on this issue see pp. 27-30,
infra.
[12]    The amount of the collection fee was originally set at 20%, but was reduced to 16.66% sometime
around October of 2014. N.T. 3/9/16 trial, p. 18.

When an account was turned over to ARB for collection, RAWA
would no longer process payments sent to it by its customers. Instead, RAWA
forwarded any payments it received from a delinquent customer to ARB. ARB
would deduct its collection fee and remit the remainder of the payment to RAWA.
RAWA then applied the payment balance to the customer's oldest outstanding bill.
RAWA turned Heckman's account over to ARB for collection in August 2012.
N.T. 3/9/16 trial, p. 15. Consistent with RAWA's internal policies and procedures,
when Heckman's account was turned over to ARB, most of the bills Heckman
received from RAWA showed only the dollar amount of the current charge with a
notation "MUST CALL" beside the column marked "PAST DUE AMOUNT." A
customer cannot possibly determine the total amount owed from the invoice sent
by RAWA.

When Heckman began receiving bills from ARB, he erroneously
relied upon a statement contained in the ARB invoices about disputing a bill as
authorization for him to withhold payments to ARB that he believed were not
owed. Audio record of Feb. 19, 2016 trial, 10:21:06 – 10:29:08; Exhibit D-1,
contained in Tab P-5. Nothing in the bills, however, authorized a customer to
withhold payment of disputed bills. The bills merely advised customers that they
had the right to dispute a bill within thirty days of the date they receive the bill. In
such a case, ARB will obtain, and send to the customer, verification of the debt or

a copy of a judgment if one exists. Nothing in any bill Heckman received from

ARB authorized him to withhold payment of the bills he disputed.

To further complicate matters, Heckman was confused by the "PAST

DUE", "MUST CALL" language contained in RAWA's bills. He testified

convincingly that he never knew the total amount of his outstanding balance. This

led him to send checks to RAWA with restrictive endorsements such as "Final

owed" and "Paid in Full" written on the memo line of the checks. As time went on,

Heckman began to believe that RAWA and ARB were not properly accounting for

payments he made and that they owed him a refund of $368.71. Specifically,

Heckman believed that RAWA or ARB failed to apply $299.24 that he had paid on

his account and, as a result, he was improperly charged $69.47 in collection costs.

In March 2013, Heckman filed a complaint with the Office of the

Comptroller of the Currency and the Consumer Financial Protection Bureau

claiming: "Fulton Bank as agent for [RAWA] refuses to pay me $368.71 in monies

missing from my payments and unfounded penalties added on: $299.24 total

missing $69.47 penalties." Fulton Bank and the Office of the Comptroller of the

Currency responded in writing to Heckman's complaint on March 22, 2013, and

March 26, 2013, respectively. Both concluded that Fulton Bank was acting simply

as a payment collection agent, otherwise known as a lockbox service provider, for

RAWA and that Fulton Bank deposited all payments made by Heckman into

RAWA's checking account. They also both confirmed that Fulton Bank has

nothing to do with assessing penalties on customer accounts. <u>See</u> Exhibit D-1, Tab

P-5.[13]

On November 26, 2013, Heckman received a delinquency door tag at

101 Walnut, which tag stated that his water service would be turned off without

further notice if payment in full were not received within ten days. The amount

indicated as required to be paid to avoid service interruption was $2,694.03. <u>See</u>

Exhibit D-4. In December 2013, Heckman filed the first of his four chapter 13

petitions, which case was dismissed on January 9, 2014. On January 24, 2014,

Heckman filed his second chapter 13 petition, which was dismissed on November

20, 2014. On December 5, 2014, ARB sent two notices to Heckman advising him

that water service would be turned off at both 101 Walnut and 153 Walnut if

payment in full were not received on each account within ten days. The amount to

be paid to avoid service interruption at 101 Walnut was $1,906.61; the amount to

be paid to avoid service interruption at 153 Walnut was $247.52. Delinquency door

tags were also hung at both locations on that date. Heckman filed his third chapter

13 petition on December 17, 2014, and on December 19, 2014, the third case was

---

[13]      It is unclear, based on the record before me, whether the Consumer Financial Protection Bureau
responded to Heckman's complaint, but I would not expect its conclusion to be any different.

dismissed. On December 29, 2014, Heckman filed the chapter 13 case that is

presently pending, his fourth bankruptcy filing in about 13 months.

# III.  SUBSTANTIVE DISCUSSION

## A. Heckman's evidence relating to violation of the automatic stay failed to establish that RAWA violated the stay, that he suffered actual damages as a result of the alleged violation, or that he is entitled to punitive damages.

Section 362(k)(1) of the Bankruptcy Code provides, in relevant part:

> [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. §362(k)(1). Section 362(k)(1) is straightforward and mandates the

imposition of damages against a creditor if the debtor can establish that (1) the

creditor willfully violated the automatic stay and (2) the violation of the stay

caused the debtor some injury. In re Miller, 447 B.R. 425, 433 (Bankr. E.D. Pa.

2011); Wingard v. Altoona Regional Health Systems and Credit Control

Collections (In re Wingard), 382 B.R. 892, 900 (Bankr. W.D. Pa. 2008).

Heckman maintains that RAWA violated the automatic stay because

they sent invoices to him, which invoices allegedly sought to collect pre-petition

debts. Before addressing the merits of his argument, I reiterate the decision in my February 19, 2015, and January 26, 2016 Orders. Because Heckman had three prior bankruptcy cases pending within one year of the date this fourth bankruptcy case was filed, each of which was dismissed, no automatic stay went into effect when Heckman filed this bankruptcy case. <u>See</u> 11 U.S.C. §362(c)(4)(A)(i). Instead, the stay did not exist until February 19, 2015, when I entered an Order in the main bankruptcy case granting Heckman's motion to extend[14] the automatic stay under 11 U.S.C. §362(c)(4)(C).

I previously ruled in my January 26, 2016 Order, that my February 19, 2015 Order was not retroactive, and therefore, the automatic stay was not retroactively imposed back to the petition filing date of December 29, 2014. Instead, the automatic stay first took effect in this bankruptcy case on February 19, 2015. 11 U.S.C. §362(c)(4)(C). As I previously concluded in my January 26, 2016 Order, therefore, any action taken by RAWA from the filing date of the bankruptcy petition through February 18, 2015 (the day before the automatic stay was imposed in this case) did not and could not violate the automatic stay, which did not then exist.

---

[14]    This is the nub of Heckman's argument. Because I ordered that the automatic stay would "extend" throughout the duration of this case (unless relief from stay were sought and granted), Heckman argues that I must have meant the stay was extended from the day his petition in bankruptcy was filed. To the contrary, on February 19, 2015, I extended the automatic stay from that date until it might be challenged at some other time in this case. <u>See also</u>, p. 6, n. 7, <u>supra</u>.

I have reviewed the invoices RAWA sent to Heckman from February 19, 2015, and forward. See Exhibit D-1, Tab P-3. One invoice for 101 Walnut, dated March 6, 2015, with a due date of March 31, 2015, has the figure "4528.68" inserted inside a box marked "PAST DUE AMOUNT." This invoice and possibly others, could be construed to seek payment of a total past due amount of $4,528.68. I suppose from the large amount that was past due that at least part of the $4,528.68 past due balance might have included some pre-petition charges. But Heckman did nothing to prove his point and therefore my thoughts remain suppositions of limited merit. Several other such bills contained the words "MUST CALL" inside the box adjacent to the words, "PAST DUE AMOUNT." Those bills were statements of the amount owed to RAWA and ARB. Heckman did not call ARB so he was never asked, encouraged, or told to pay the bills.

Heckman argues that mailing these statements constituted attempts to collect pre-petition debts because they advise Heckman that he "MUST CALL" to find out whether he owes a past due amount, which supposedly could include pre-petition balances. I do not construe them that way and, once again, Heckman relies on supposition.

The burden was on Heckman to prove: (1) RAWA violated the automatic stay by mailing the invoices; and (2) RAWA's violation of the automatic stay caused him some injury. Even if Heckman did show that RAWA's mailing of

17

the invoices violated the automatic stay (which I find that he did not), he showed

nothing about any injury or damage as a result of the alleged violation. Typically, a

debtor can receive an award of attorney's fees if he proves that a creditor willfully

violated the automatic stay. Heckman, however, is appearing pro se and has not

incurred any attorney's fees that could form the basis for such a recovery. Nor has

Heckman presented evidence of his costs of litigating the adversary proceeding or

any other type of injury or damage he suffered from RAWA's mailing of the bills.

The burden was on Heckman to prove with reasonable certainty that he suffered

actual injury or damage as a result of RAWA's mailing the bills. Mere speculation,

guess, or conjecture about damages cannot suffice. Iskric v. Commonwealth Fin.

Sys., Inc. (In re Iskric), 496 B.R. 355, 364 (Bankr. M.D. Pa. 2013). Heckman

failed to meet his burden, so I will not award actual damages.

Turning to Heckman's request for punitive damages, I note that

"punitive damages may be awarded against a [creditor under section 362(k)(1)] to

punish him for outrageous conduct and to deter him, or others like him, from

similar conduct in the future," Id. at 365. Heckman's argument is that some of

RAWA's mailed statements possibly included pre-petition amounts allegedly owed

and therefore constituted outrageous conduct. Nothing on the record, however,

establishes this as an outrageous, reckless, or otherwise egregious act. To the

contrary, it is possible that, if any erroneous inclusion of pre-petition charges in the

statements existed, the error stemmed from the fact that Heckman confused the

record by filing four chapter 13 bankruptcy petitions within about 13 months. His

serial filings may well have made it difficult for RAWA to insure that no bill

included charges incurred while any of the four bankruptcy petitions were pending.

For these reasons, I find that Heckman failed to meet his burden of proving both

that RAWA violated the automatic stay and that he suffered any actual injury or

damage as a result of RAWA's mailing the offending statements. Similarly, I find

that Heckman did not prove that RAWA acted in an outrageous, reckless, or

otherwise egregious fashion by mailing the offending bills to Heckman. As a

result, I will enter judgment on Heckman's Section 362(k)(1) complaint in favor of

RAWA and against Heckman.

My finding of no proof of outrageous conduct, recklessness, or

otherwise egregious acts by RAWA in my analysis of the automatic stay issue does

not pertain to the issue of the amount of the debt owed to RAWA by Heckman as

described in RAWA's claim. My review of Heckman's objection to RAWA's

claim number 6, including RAWA's conduct and administration of the collection

fees that are part of the Heckman accounts, follows.

## B. Heckman's objection to RAWA's claim is sustained in part and overruled in part; RAWA holds a secured claim in the amount of $5,011.90, less all ARB collection fees included in RAWA's claim and all collection fees that Heckman paid since February 2012.

On May 7, 2015, RAWA filed proof of claim number 6, in which it alleged that it is the holder of a secured claim in the amount of $5,608.09 for water and sewer charges, late payment penalties, and collection fees. RAWA's claim relates to the water and sewer service RAWA provided to Heckman's rental properties located at 101 Walnut and 153 Walnut.  Heckman filed both his objection to RAWA's claim and his adversary complaint on July 10, 2015. Heckman maintains that he does not owe RAWA any money for water, sewer charges, or collection fees. Heckman alleges that RAWA owes him a refund for alleged overpayments on his account and for certain payments he alleges he made that were never credited to his account. During the trial, RAWA withdrew the portion of its claim that relates to 153 Walnut. The elimination of the 153 Walnut matter from contention reduced RAWA's claim to $5,212.94. The remainder of this Opinion therefore will address RAWA's claim as it relates only to 101 Walnut.

Suzanne Ruotolo, the Customer Account Manager for RAWA,[15]

testified at length and in detail chronicling invoices sent to Heckman and payments

received from Heckman, that were credited to his account for 101 Walnut. Ms.

Ruotolo identified and authenticated three Exhibits that track the billings sent, and

the payments made, on Heckman's account for 101 Walnut. Exhibit R-2 is a

Customer History Report for Heckman's account for 101 Walnut (the "CHR").

The CHR was generated on software known as "Caselle," which RAWA began

using in May 2012 (a few months after the present difficulties between the parties

started). Ms. Ruotolo accepted the data she received from Caselle and incorporated

it into her reports. Exhibit R-5 is a Utility Account Summary for Heckman's

account for 101 Walnut (the "UAS"). The UAS was generated on software known

as "Hansen" which RAWA had used until May 2012, when it switched to Caselle.

Exhibit R-1 is a spreadsheet Ms. Ruotolo created by extracting, compiling, and

manipulating information from both the CHR and the UAS.

Presumably because he is acting pro se, Heckman did not raise any

objection about Ms. Ruotolo's failure to develop a full foundation for these

documents. She said little about who actually entered the data in the reports that

she compiled for the purpose of this litigation. She also testified that she got some

---

[15]    Ms. Ruotolo had been employed by RAWA from about 2010 to the dates of the hearings. Before
that, she was employed by ARB for 15 years. While she worked for ARB, she handled the RAWA
account.

of the data from the city of Reading rather than ARB. N.T. 3/9/16 trial, pp. 6 - 8,

55 – 56. Similarly, she acknowledged that the original Hansen charts and numbers

were not available for further review. N.T. 3/9/16 trial, p. 55-56.  Despite a lack of

a full foundation about the genesis, recording, and storage of the data on which she

relied, I find that the reports were records on which RAWA relies on a regular

basis in conducting its business. On that basis, I disregard any possible taint on the

admissibility of the CHR, the UAS, and the spreadsheets.

Ms. Ruotolo testified that the last date Heckman's 101 Walnut

account had a zero balance was March 29, 2011. As reflected in Exhibit R-1, the

total water and sewer charges billed to Heckman's account for 101 Walnut

(excluding collection fees and late payment penalties) from March 29, 2011, (when

the account last had a zero balance) until December 4, 2014, was $13,409.05.

Late payment penalties for 101 Walnut for this time period totaled

$1,228.84 and collection fees for 101 Walnut for this time period totaled $707.17.

Hence, the total charge billed to Heckman's account for 101 Walnut for all water

and sewer charges, all collection fees and all late payment penalties for the time

period beginning March 29, 2011, and ending December 4, 2014, was $15,345.06.

Exhibit R-1 also shows that the total amount paid by Heckman for all charges on

his account for 101 Walnut (including collection fees and late payment penalties)

for this time period was $10,132.12. RAWA calculated the amount of its claim for

101 Walnut by subtracting the total amount paid by Heckman on his 101 Walnut

account for this time period ($10,132.12) from the total amount billed ($15,345.06)

to Heckman's 101 Walnut account for this time period. The difference between

these two amounts equals $5,212.94, and forms the basis for RAWA's proof of

claim for water and sewer charges, late payment penalties, and collection fees for

101 Walnut.

Heckman maintains that this claim is erroneous because RAWA failed

to apply or properly credit certain payments he allegedly made. He referred to

these payments as the "missing payments" throughout his testimony and in many

of his Exhibits. Heckman listed these "missing payments" in Exhibit D-3, Tab P-8.

Ms. Ruotolo, however, credibly testified that all of the alleged "missing

payments," except four, had been credited to Heckman's account. See N.T.,

3/19/16 trial, pp. 17-18. As I discuss in more detail below, Ms. Ruotolo was able to

explain why three of the alleged "missing payments" were not credited to

Heckman's account, which leaves a single "missing payment" that Heckman

actually paid, but which RAWA did not credit to his account.

Heckman listed the following "missing payments" in Exhibit D-3, Tab

P-8: $141.83, $352.24, $310.13, $600.00, $316.92, $500.00, $170.33, $306.59,

$418.83, $153.54, $175.57, $893.37, $59.36, $225.75, $262.10, $207.65, $201.04

and $329.71. Ms, Ruotolo testified that all of these alleged "missing payments"

23

had been applied to Heckman's account except the following four: (1) The

"alleged missing payment" of $306.59; (2) the alleged "missing payment" of

$418.83; (3) the alleged "missing payment" of $207.65; and (4) the alleged

"missing payment" of $201.04.

Regarding the alleged "missing payments" of $306.59 and $418.83,

Heckman was unable to produce receipts or canceled checks to prove that these

amounts were actually paid and Ms. Ruotolo credibly testified that RAWA never

received these payments. Ms. Ruotolo explained that while these figures appear on

Exhibit R-2, they are accounting entries used to classify two payments in the

amount of $170.33 and $153.54 that RAWA received from Heckman and then sent

to ARB for processing and payment of the collection fee. After ARB received

these two payments from RAWA, it deducted the collection fees and sent the

remaining amount to RAWA to credit to Heckman's account. See N.T. 3/9/16 trial,

p. 21. The $306.59 and $418.83 figures, therefore, were accounting entries made

by RAWA to account for (1) its initial receipt of payments from Heckman, (2)

RAWA's forwarding to ARB of the payments it received from Heckman, and (3)

RAWA's subsequent receipt of the balance of the payments from ARB after

deduction of the collection fees. Based on Ms. Ruotolo's credible testimony and

Heckman's failure to produce receipts or canceled checks to prove that he made

the alleged "missing payments" of $306.59 and $418.83, I find that these alleged

"missing payments" were never actually paid and are therefore not "missing."

I turn next to the alleged "missing payment" of $207.65. Heckman

admits that he wrote "PAID IN FULL" on this check. Exhibit D-3, Tab P-8.  Ms.

Ruotolo credibly testified that RAWA received Heckman's check for $207.65, but

did not process it because of the restrictive endorsement "PAID IN FULL" on the

check. N.T. 3/9/16 trial, pp. 36-37. In addition, Heckman never produced a

canceled check to prove that RAWA actually negotiated it. Based on this evidence,

I find that the check in the amount of $207.65 was never processed or cashed by

RAWA due to the restrictive endorsement on the check. The $207.65 check is not

a "missing payment."

Finally, I address the last "missing payment," which was $201.04.

Heckman produced a copy of a check dated March 26, 2013 in the amount of

$201.04 made payable to RAWA (check 3623). Exhibit D-3, Tab P-8. Ms. Ruotolo

testified that RAWA did not credit Heckman's account with this payment although

the check was received and processed by ARB. N.T. 3/9/16 trial, pp. 37-38. Based

on this evidence, I find that RAWA, through its agent, ARB, actually received the

"missing payment" of $201.04, and that neither ARB nor RAWA applied the

payment to Heckman's account. This $201.04 payment is actually a "missing

payment" and Heckman is entitled to a credit against RAWA's proof of claim in

the amount of $201.04. As a result, RAWA's proof of claim in the amount of
$5,212.94 for 101 Walnut alone must be reduced by $201.04, which brings the
amount of RAWA's claim to $5,011.90.

Heckman also argues that he was entitled to withhold payment to
RAWA and ARB of disputed bills while the disputes were being investigated. He
erred in this argument based on two incorrect contentions. First, Heckman
contends that a provision of a RAWA ordinance that deals solely with initial
applications for water service permitted him to withhold payment of disputed bills.
See Exhibit D-1, contained in Tab P-2, June 30, 1994 RAWA Resolution, Rules
and Regulations, §5(c)(iii). Because Heckman was already receiving water service
from RAWA, this regulation did not apply to Heckman's account.[16]

Second, Heckman contends that a statement contained in the ARB
invoices that deals with disputing a bill authorized him to withhold payments to
ARB of amounts he believed were not owed. See audio recording of 2/19/16 trial,
10:21:06 – 10:29:08; Exhibit D-1, contained in Tab P-5. This portion of the ARB
invoice, however, does not authorize a customer to withhold payment of disputed
bills. It merely advises customers that they have the right to dispute a bill within
thirty days after they receive the bill.[17] It goes on to state that in such a case, ARB

---

[16]      See also discussion, supra, at p. 9-10.
[17]      See discussion, supra, at pp. 12-13.

will obtain, and send to the customer, verification of the debt or a copy of a

judgment if one exists. Nothing in the invoices Heckman received from RAWA,

ARB, or otherwise authorized him to withhold payment of a bill he disputed. For

these reasons, Heckman was not entitled to withhold payment from RAWA and

ARB of disputed bills.

Heckman challenges whether RAWA may charge him with a service

fee during the time that water service had been shut off due to non-payment. The

record shows, however, that water service was only shut off for 153 Walnut. The

water service to 101 Walnut was never shut off. RAWA, however, withdrew its

proof of claim for water and sewer charges, late payment penalties, and collection

fees for 153 Walnut. Because RAWA does not seek to collect a service fee for

either 101 Walnut or 153 Walnut, the question whether the service fee may be

charged when water service was shut off is moot.

Finally, it was apparent (although not specifically addressed) during

the trial on March 9, 2016, that RAWA systemically miscalculated the number

of days its customers were delinquent on their water bills. I am reminded that

RAWA's stated policy is to impose collection fees when a customer becomes 91

days delinquent and has a balance due of more than $100. In one example of the

miscalculations, the water bill for 101 Walnut dated January 11, 2013, was due

to be paid by January 31, 2013. N.T. 3/9/16 trial, pages 123 - 129; Exhibit D-7.

Case 15-00317-ref   Doc 70   Filed 12/06/16   Entered 12/06/16 11:08:21   Desc Main
Document   Page 28 of 32


Ms. Ruotolo testified that as of her April 4, 2013, email to Heckman, Exhibit D-3, Tab P-8, he was over 90-days delinquent on the bill that had a due date of January 31, 2013. She noted that his bill remained unpaid the fourth month after it was due. Ms. Ruotolo's calculations, however, violate RAWA's delinquency policy.[18]

When Heckman failed to pay the bill due January 31, 2013, by February 28, 2013, he was 28-days delinquent. When Heckman failed to pay the January bill by March 31, 2013, he was another 31 days late, which made the total delinquency 59 days. Ms. Ruotolo's email on April 4, 2013, informed Heckman that he was over 90-days delinquent, presumably as of April 1, when the total delinquency was actually 60 days, not 91 or more. See N.T. 3/9/16 trial, pp. 123 – 140. Heckman was not over 90 days late on this bill, it should not have been in collection, and no collection fee should have been added to his bills.

More importantly, when pressed on the basic arithmetic highlighting this bogus procedure, Ms. Ruotolo did not say that this calculation was an aberration. She explained that the over 90-days delinquency was imposed on the fourth month a payment was not made. She acknowledged that the number of delinquent days was far less than 90. N.T. 3/9/16 trial, pp. 123 - 140.

---

[18]     As a 5th or 6th grade school student would have observed. See p. 1, supra.

RAWA's policy was that any invoice that had not been collected by the fourth
calendar month after the due date was deemed to be delinquent, without regard
to whether it was over 90 days late. The invoice examined above was due
January 31 and therefore became delinquent, according to RAWA, in April – the
fourth calendar month that the invoice was due, despite the passage of only 60
days. A June invoice, payable on June 30, would be delinquent on September 1,
the fourth calendar month later, but only 63 days later. Stuff and nonsense![19]

RAWA's faulty calculations appear to have been systemic, which is
extremely troublesome and very unsettling. Ms. Ruotolo's testimony about this
practice, which violated the 90-day delinquent account policy, was straight-
forward and innocently given. She acted as if the clear difference between
practice and policy was of no consequence. RAWA's practice casts a dark
shadow on the entire system of RAWA declaring delinquency and ARB
imposing collection fees on RAWA's customers. RAWA's calculations of when
collection fees should be sought is rendered totally suspect. I find and conclude
therefore that I will not consider as reliable or accurate any of RAWA's over 90-
days delinquency calculations. I find and conclude that all of the collection fees
assessed against Heckman's account for 101 Walnut shall be stricken and

---

[19]    An exclamation of incredulity, first published in <u>The London Times</u>, June 1827: "[A]ll notions of
concerting and of dictating to the King in the exercise of his prerogative, was mere stuff and nonsense."

disallowed. I will order RAWA to account for every collection charge included in the claim amount. Moreover, I will order RAWA to account for every collection fee that Heckman paid to either ARB or RAWA since February 2012 even if it is not in the present amount of RAWA's claim. All collection fees from and including February 2012 that were paid by Heckman to either ARB or RAWA shall be deducted from RAWA's claim. If the accounting of collection fees to be reimbursed leads to a refund to Heckman, so be it. To be clear, any collection fees in RAWA's claim number 6 shall be stricken and disallowed from the amount claimed. And any collection fees paid by Heckman that exceed the amount of RAWA's claim number 6 shall be refunded to him in one of two ways. First, Heckman would get a credit against the amount he owed to RAWA on its proof of claim or, second, if the credit exceeds the amount of RAWA's claim, RAWA would pay the excess amount to Heckman on or before December 30, 2016.

# IV.  CONCLUSION

For the reasons discussed above, I find and conclude that Heckman failed to meet the burden required to establish RAWA's violation of the automatic stay. I also find and conclude that Heckman failed to meet the burden required for damages or sanctions to be imposed against RAWA for its alleged

violation of the automatic stay. Heckman also failed to prove that RAWA acted

in an outrageous, reckless, or otherwise egregious fashion as it pertained to the

automatic stay and I find and conclude that his request for actual and punitive

damages against RAWA for violating the automatic stay must be denied.

Furthermore, I find and conclude that RAWA, through its agent,

ARB, received a payment from Heckman in the amount of $201.04, but failed to

apply it to Heckman's account. As a result, RAWA's proof of claim for

$5,212.94 for 101 Walnut alone must be reduced by $201.04, resulting in

RAWA's claim for 101 Walnut being $5,011.90.

Finally, I find and conclude that RAWA systemically miscalculated

the number of days before a bill could be considered 91-days delinquent and

referred to arb for collection. At least one of Heckman's bills was incorrectly

declared to be 91-days delinquent and was improperly sent to collections.

RAWA presented no evidence that the faulty delinquency determination for that

bill was an aberration and not endemic to RAWA's standard practices. This is

extremely troublesome and unsettling. The entire delinquency date calculation

system used by RAWA is therefore suspect. This leads me to find and conclude

that none of RAWA's delinquency date calculations relating to Heckman can be

deemed reliable. I find, therefore, that all collection fees assessed against

Heckman's account for 101 Walnut must be stricken from RAWA's claim and

disallowed. In addition, RAWA shall account for any and all collection fees paid

by Heckman since February 2012 and shall reduce its claim by all amounts paid

by Heckman for collection fees since February 2012.

I will enter an Order that accompanies this Memorandum Opinion:

(1) entering judgment on Heckman's section 362(k) complaint against him and

in favor of RAWA; (2) sustaining in part and overruling in part Heckman's

objection to RAWA's claim and determining that RAWA holds a secured claim

in the amount of $5,011.90, minus all collection fees assessed against or paid by

Heckman whether included in RAWA's claim or paid by Heckman to ARB from

February 2012 to present; and (3) directing RAWA to (a) file an amended proof

of claim reflecting (i) the deduction of all collection fees included in the present

claim and (ii) the deduction of all collection fees not included in the present

claim but paid by Heckman since February 2012, and (b) pay to Heckman a

refund of all collection fees paid since February 2012 in excess of the amount in

RAWA's claim, consistent with the terms of this Memorandum Opinion and

accompanying Order.

Date:  December 6, 2016

_____

RICHARD E. FEHLING
United States Bankruptcy Judge